# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-1945V

|  |  |
|---|---|
| ELISHA M. PRICE, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: September 10, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Richard H. Moeller, Moore, Corbett, Moeller & Meiss LLP, Sioux City, IA for Petitioner.*

*Katherine Edwards, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT[1]

On October 1, 2021, Elisha Price filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") following her receipt of an influenza ("flu") vaccine on October 5, 2018. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

After review of the record and the parties' arguments, I conclude that Petitioner's shoulder pain more likely than not began within 48 hours of vaccination, and that no other

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

condition or abnormality was present that would explain her symptoms. Petitioner has established all other requirements for a Table SIRVA. Accordingly, she is entitled to compensation.

I.  **Procedural History**

On February 10, 2022, this case was assigned to the SPU. ECF No. 13. Petitioner filed additional medical records thereafter. On March 31, 2023, Respondent stated his position contesting compensation. ECF No. 45. He subsequently filed a Rule 4(c) Report on July 15, 2023. ECF No. 48 ("Rule 4(c) Report"). Respondent opposed entitlement on the grounds that Petitioner had not established that her shoulder pain began within 48 hours of vaccination, and that she was diagnosed with cervical radiculopathy during the course of her treatment. *Id.* at 10.

I set this matter on a briefing schedule to address the issues raised in Respondent's Rule 4(c) Report. ECF No. 51. Petitioner filed a response to Respondent's Rule 4(c) Report on November 20, 2023. ECF No. 55 ("Pet'r Br."). Respondent filed a response brief on January 3, 2024. ECF No. 58 ("Resp't Br."). Petitioner filed a reply brief on January 17, 2024. ECF No. 59 ("Pet'r Reply"). The matter is now ripe for adjudication.

II.  **Relevant Evidence**

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

A.  **Petitioner's Initial Post-Vaccination Right Shoulder Treatment**

At the time of vaccination, Petitioner was 40 years old and unemployed. *See* Ex. 2 at 3; Ex. 6 at 28. Petitioner's medical history was significant for asthma, depression and anxiety, past drug abuse, and hepatitis C. Ex. 3 at 51, 57, 60-63, 68. Years before the vaccination, Petitioner suffered a serious injury to her left upper arm when her ex-boyfriend injected her with bleach. *See* Ex. 3 at 57-59, 67; Ex. 7 at 4; Ex. 19 at 8. Petitioner was in a coma "for a lengthy period of time" and developed necrosis and gangrene that required numerous reconstructive surgeries and skin grafts. Ex. 19 at 8. Due to this injury, Petitioner did not receive vaccines in her left arm. Ex. 1 at 1; Ex. 7 at 11. Petitioner did not have any prior injury or pain in her right shoulder.

2

On October 5, 2018, Petitioner received the tetanus-diphtheria-acellular pertussis ("Tdap"), hepatitis A vaccine, and flu vaccine at a Rite Aid pharmacy.³ Ex. 2 at 3-4. In her affidavit, submitted with her Petition, Petitioner stated that "[i]mmediately upon receipt of the flu vaccine, [she] started to experience extreme pain in the higher area of [her] shoulder where the flu shot was placed." Ex. 1 at 2. Petitioner also recalled that she went to Rite Aid with her mother and grandmother, who also received the flu vaccine, and that she complained to them about her pain. *Id.* Further, Petitioner asserted that her pain "remained intense" and she "waited a few weeks for the pain to ease and go away, but it did not." *Id.*

On October 25, 2018, Petitioner went to her primary care practice, Corbin Family Health Center ("CFHC"), and was seen by physician's assistant ("PA") Matthew Webb. Ex. 3 at 47. Petitioner complained of right shoulder pain that "did not radiate." *Id.* PA Webb wrote that "[t]he pain initially started one month ago" and that "[t]here was no obvious precipitating injury." *Id.* PA Webb took x-rays of Petitioner's shoulder, which were normal. Ex. 3 at 78; Ex. 10 at 311.

Petitioner returned to CFHC and PA Webb on November 2, 2018. Ex. 3 at 45. At this appointment, Petitioner sought to be evaluated for irritable bowel syndrome ("IBS"). *Id.* Additionally, PA Webb noted in the musculoskeletal section of his routine assessment that Petitioner had right shoulder and neck pain. *Id.* PA Webb referred Petitioner to physical therapy ("PT") at this time, presumably for her shoulder and neck pain and not IBS, but she did not follow up. *Id.* at 46.

Petitioner did not have any further appointments until April 16, 2019, when she saw PA Webb and again complained of pain in her right shoulder. Ex. 3 at 43. Petitioner reported that she had "several vaccinations back in the Fall (October 2018) at Rite Aid in her right shoulder muscle and has had pain ever since." *Id.* PA Webb referred Petitioner to an orthopedist.⁴ *Id.* at 43-44.

---

³ There are some ambiguities in the record as to what vaccines Petitioner received and their situs. The Rite Aid screening and consent form indicated that Petitioner received the hepatitis A vaccine in her left deltoid, which seems unlikely due to the injury to Petitioner's left arm described above. *See* Ex. 2 at 4. Additionally, Petitioner contends specifically that it was the flu vaccine that caused the alleged SIRVA because it was the last to be administered and the nurse indicated that she would perform the injection higher on Petitioner's shoulder to spread out the vaccines. *See* Ex. 1 at 5. Petitioner also contends that she received the hepatitis B, not hepatitis A, vaccine. *Id.* at 1. Given that all vaccines received by Petitioner on October 5, 2018 (including both hepatitis A and hepatitis B) are covered by the Vaccine Act and Respondent does not contest situs, there is no need for any further discussion of which vaccine specifically caused Petitioner's symptoms.

⁴ Petitioner suggests that PA Webb "administered Petitioner's first steroid injection" due to her right shoulder pain. Pet'r Br. at 3. However, it appears that PA Webb prescribed only a topical steroid cream and administered an intramuscular steroid injection, because Petitioner also complained of poison ivy on her

3

On June 17, 2019, Petitioner saw orthopedist Dr. Ronald Belhasen. Ex. 4 at 89. Petitioner attributed her right shoulder pain to "receiving an injection on October 25, 2018" and stated that the pain began the evening of that day.[5] *Id.* Petitioner denied experiencing any numbness or weakness in that arm. *Id.* Dr. Belhasen found that Petitioner's symptoms "present[ed] as rotator cuff tendinitis or bursitis" and decided to order an MRI to "exclude [an] intramuscular source of her symptoms" before sending her to PT. *Id.* at 91.

Petitioner underwent the MRI and had a follow-up appointment with Dr. Belhasen on July 22, 2019. Ex. 4 at 74. The MRI showed a "small subcortical contusion of the lateral margin of the humeral head underneath/subjacent to the deltoid musculature with overlying cortical defect" and "minimal overlying edema of the deep portions of the deltoid muscle at level of subcortical contusion of humeral head." *Id.* The MRI was otherwise unremarkable. *Id.* Dr. Belhasen did not agree with the MRI report than a small cortical erosion was a contusion because Petitioner had not reported direct trauma. *Id.* Instead, Dr. Belhasen ordered blood work to rule out an infection. *Id.*

On July 31, 2019, Petitioner had another follow-up appointment with Dr. Belhasen. *Id.* at 59. Petitioner again reported that her right shoulder pain began in "October" when she received her vaccinations. *Id.* Petitioner's blood work did not show any signs of infection. *Id.* Dr. Belhasen believed that it would be beneficial to order a bone scan. *Id.* However, the bone scan did not show any abnormalities. Ex. 10 at 204-205.

On August 28, 2019, Petitioner returned to Dr. Belhasen. Ex. 4 at 45. Dr. Belhasen stated that Petitioner's symptoms were "consistent with rotator cuff tendinitis versus subacromial bursitis." *Id.* Dr. Belhasen administered a lidocaine and a steroid injection to the subacromial space. *Id.*

Petitioner had her final appointment with Dr. Belhasen on October 28, 2019. *Id.* at 27. Petitioner had not received any relief from the prior injections and "continue[d] to localize pain lateral proximal aspect of her right shoulder." *Id.* Dr. Belhasen informed Petitioner that he had nothing further to offer. *Id.* at 28. At Petitioner's request, Dr. Belhasen provided a referral to the University of Kentucky Medical Center ("UKMC"). *Id.*

---

left shoulder and chest. Ex. 3 at 43-44.

[5] It is unknown if Petitioner or Dr. Belhasen incorrectly stated the date of vaccination as October 25, 2018, rather than October 5, 2018.

**B.      Petitioner's Treatment at UKMC and First Two Courses of Physical Therapy**

On December 10, 2019, Petitioner was seen by Dr. Scott Mair, an orthopedic surgeon at UKMC. Petitioner described her October 2018 vaccinations, and told Dr. Mair that "immediately following the injection she noticed right shoulder pain." Ex. 7 at 11. On examination, Petitioner had a positive painful arc test and Hawkins' test. *Id.* Dr. Mair recommended PT and told Petitioner that her symptoms would gradually improve over time. *Id.* at 13.

Petitioner had an initial evaluation with Corbin PT on January 2, 2019. Ex. 5 at 9. Petitioner complained of "constant pain along her right middle deltoid area" that had been brought on by the vaccinations on October 5, 2018. *Id.* Petitioner attended ten more PT sessions between January 6, 2020 and February 6, 2020. Petitioner's insurance would not cover any further PT, so she was discharged with a home exercise program. *Id.* at 37.

Petitioner maintains that she did not have any further medical appointments until June 2020, due to the COVID-19 Pandemic. Ex. 1 at 3. On June 25, 2020, Petitioner returned to UKMC, where she was seen by Dr. Sean Marx, a colleague of Dr. Mair. Ex. 7 at 9. Dr. Marx stated that Petitioner "related an incident in which she had 3 immunizations into the right shoulder approximately 3 years ago and since that time has had lateral shoulder pain."[6] *Id.* Dr. Marx found Petitioner's complaints to be consistent with rotator cuff tendinitis and referred Petitioner for a subacromial steroid injection. *Id.* at 10. Petitioner received this injection on August 19, 2020. *Id.* at 7-8.

On September 15, 2020, Petitioner had a follow-up appointment at UKMC with Dr. Brandon Barnes, another colleague of Drs. Mair and Marx. Ex. 7 at 4. Dr. Barnes noted that Petitioner had attempted multiple treatments without any relief, but still had "mostly constant" pain. *Id.* Petitioner denied any numbness or tingling. *Id.* Dr. Barnes referred Petitioner to Physical Medicine and Rehabilitation ("PM&R") "to see if they have any other suggestions." *Id.* at 5. According to Petitioner, Dr. Barnes said "there was not much he could do for [her] and he did not believe surgery was needed." Ex. 1 at 4.

At this time, Petitioner was "pretty frustrated about the lack of answers, so [she] sat in limbo hoping [her] shoulder would heal on its own." *Id.* Petitioner had several appointments at CFHC about her mental health, gastrointestinal issues, ear/sinus issues, and dental issues, but did not discuss her right shoulder. *See* Ex. 3 at 13, 16, 18, 21, 28.

---

[6] Although October 5, 2018 was not three years earlier, there is no reason to believe that Dr. Marx was not referring to this set of vaccinations.

5

### C.     Petitioner Resumes Treatment of Her Right Shoulder Pain

Almost a year later, on August 2, 2021, Petitioner had an appointment with PA Webb at CFHC, and now brought up her right shoulder pain. *Id.* at 10. PA Webb noted that Petitioner had been having "right deltoid pain/stiffness since Oct 2018 when she got 3 shots in her right arm at a local Rite Aid." *Id.* PA Webb also wrote that the "pain/stiffness has begun radiating up into [Petitioner's] neck." *Id.* Petitioner requested a referral to PT and a neurologist. *Id.*

Petitioner had her first appointment with Cora PT on August 5, 2021. Ex. 6 at 3. At this initial evaluation, Petitioner set forth her history of having issues with her right arm since she had a "series of shots in 2018." *Id.* Petitioner described her pain as a "soreness like she just had a shot" and that the "tension runs up into her neck some too."[7] *Id.*

Petitioner attended eight more sessions at Cora PT in August/September 2021. *Id.* at 7-23; Ex. 13 at 11. At her September 14, 2021 session, Petitioner was discharged from PT for her right shoulder because she had maximized her insurance benefits. Ex. 13 at 12. Petitioner's right shoulder pain and weakness had not resolved and the therapist believed that she would benefit from further PT. *Id.*

At some of her PT sessions for her right shoulder, Petitioner also reported cervical and thoracic pain and weakness. *See* Ex. 6 at 11, 16; Ex. 13 at 11. The physical therapists also provided exercises to correct Petitioner's posture because she exhibited "flattened cervical lordosis, flattened thoracic kyphosis, [and] slight scapula protraction." *See* Ex. 6 at 22, 25. Even though she could not obtain further insurance coverage for PT for her right shoulder, Petitioner was able to continue being seen at Cora PT for this neck and back pain. *See* Ex. 13 at 15.

Petitioner received an initial evaluation for cervical/thoracic PT on September 24, 2021. *Id.* Petitioner complained of headaches two to three times a week, and tightness in her neck for "about two years" that would "go from the shoulder area and towards the shoulder blade." *Id.* In September/October 2021, Petitioner had a further seven PT sessions to address cervical and thoracic pain. *See id.* at 19-31. However, the notes for some of these appointments indicated that the physical therapists occasionally discussed Petitioner's right shoulder pain. *See id.* at 23, 29, 31. Petitioner was also listed as having two diagnoses – cervicalgia and pain in right shoulder. *See, e.g. id.* at 34. On October 18,

---

[7] Exhibit 6 contains an undated "Patient History Sheet" completed by Petitioner for Cora PT. Ex. 6 at 28. On this form, Petitioner described her chief physical complaint as "right shoulder pain – leading to neck pain." *Id.*

6

2021, Petitioner was discharged from cervical/thoracic PT when she again maximized her insurance benefits. *Id.* at 34. Petitioner was instructed to continue with a home exercise program. *Id.*

### D.   Petitioner's Neurological Treatment

In the same time period as Petitioner was attending these PT sessions, she also sought out a neurologist on referral from PA Webb. On August 10, 2021, Petitioner was seen by Dr. Marc Acob at the Neurology & Geriatric Center of Kentucky. Ex. 12 at 15. Petitioner reported numbness and tingling in her arm[8] with a "gradual" onset that "ha[d] been occurring in an intermittent pattern for 3 years." *Id.* This numbness and tingling was also described as "recurrent." *Id.* Petitioner attributed her symptoms to receiving the flu vaccine too high on her arm. *Id.*

Dr. Acob performed an electromyography ("EMG") and nerve conduction study ("NCS"). *Id.* at 15, 19-20. The NCS did not demonstrate any abnormality. *Id.* at 20. However, the EMG demonstrated "polyphasias on the paraspinal muscles." Dr. Acob therefore found "electrophysiologic evidence of a right mid-low cervical radiculopathy." *Id.* Dr. Acob prescribed meloxicam, Trileptal, and venlafaxine. *Id.* at 15.

Petitioner then had telehealth follow-up appointments with a PA in Dr. Acob's office on September 13, 2021, October 11, 2021, November 15, 2021, January 17, 2022, March 14, 2022, and June 6, 2022. Ex. 12 at 2. The notes for each appointment were identical and stated that Petitioner presented for a "[r]echeck of peripheral neuropathy." Ex. 12 at 3, 5, 7, 9, 11, 13. Petitioner reported that her pain had improved with medication and the physician assistant provided several prescription refills. *See id.* Petitioner did not return to Dr. Acob's office after her June 6, 2022 visit.

### E.   Petitioner Returns to Orthopedics and Undergoes Shoulder Surgery

On March 15, 2022, Petitioner had an appointment with PA Jason Delong at Kentucky Orthopedics and Spine for an "orthopedic evaluation and second opinion." Ex. 9 at 10. Petitioner complained of right lateral shoulder pain over the past four years and attributed it to the vaccinations. *Id.* Petitioner reported that "immediately" after vaccination she experienced "intense pain" in her shoulder and upper arm. *Id.* Petitioner also denied

---

[8] Dr. Acob's notes stated that Petitioner "presents with numbness in her left arm" but then reiterated, without specification, after a description of the October 2018 vaccinations, that she "has numbness in her arm." Ex. 12 at 15. In her brief, Petitioner asserts that Dr. Acob incorrectly identified the location of her numbness and that it actually occurred in her right arm. Pet'r Br. at 8. The notes from Petitioner's later appointments at this clinic clarified that Petitioner's symptoms were located "in the right upper arm." Ex. 12 at 3, 5, 7, 9, 11, 13.

any paresthesias in her right upper extremity and any associated neck pain. *Id.* On examination, PA Delong found that Petitioner had a positive Hawkins test, positive empty can test, mildly positive AC compression test, and positive cross arm test. *Id.* at 11.

PA Delong therefore assessed Petitioner as having right shoulder subacromial bursitis with impingement and recommended an MRI. *Id.* Petitioner underwent the MRI on April 13, 2021. *Id.* at 14-15. The MRI revealed a SLAP tear, mild supraspinatus tendinopathy, mild hypertrophic AC joint arthropathy, and mild subdeltoid/subacromial bursitis. *Id.*

Petitioner had a follow-up appointment on April 18, 2022 at Kentucky Orthopedics and Spine with a different PA, Brandon Embry, to review the MRI results. *Id.* at 12-13. PA Embry administered a steroid injection to Petitioner's AC joint. *Id.* at 13. Petitioner was also considered a candidate for surgery if she continued to have pain. *Id.*

Petitioner had another follow-up appointment at Kentucky Orthopedics and Spine on May 9, 2022. Ex. 20 at 28. Petitioner reported that the previous steroid injection only provided relief for three to four days. *Id.* Petitioner was considered to have failed conservative treatment. *Id.* Petitioner agreed to undergo an outpatient arthroscopy on her right shoulder. *Id.* at 29.

On July 27, 2022, Petitioner had a pre-op appointment with orthopedic surgeon Dr. Gregory Grau. Ex. 14 at 9-10. Dr. Grau noted that Petitioner had attempted "multiple modalities of conservative measures" but had persistent right shoulder pain for years. *Id.* Dr. Grau's impression was right shoulder impingement, AC arthritis, and labral tearing. *Id.* at 10.

Petitioner underwent surgery with Dr. Grau on August 3, 2022. Ex. 14 at 16. Dr. Grau performed a right shoulder arthroscopy, subacromial decompression bursectomy, acromioplasty, distal clavicle excision, and biceps tenodesis. *Id.* Petitioner had a post-op follow-up appointment on August 10, 2022 with PA Embry and was cleared to begin PT. *Id.* at 12.

From August to October 2022, Petitioner participated in 26 sessions of post-op PT until she reached the limit of her insurance benefits. Ex. 13 at 35-68; Ex. 16 at 2-24; Ex. 18 at 6. Petitioner had some progress and improvement but was still experiencing pain in her right shoulder at her last PT session. *See* Ex. 16 at 2-24. Petitioner also had post-op follow-up appointments with Dr. Grau on October 26, 2022 and December 7, 2022, during which she reported having some persistent pain with movement as well as weakness in her right shoulder. Ex. 15 at 9; Ex. 17 at 9.

### F.     Petitioner Receives Further Treatment, Including for Neck and Back Pain

At her appointment with Dr. Grau on December 7, 2022, Petitioner described pain "on the right side of her neck radiating to the shoulder." Ex. 17 at 9. Dr. Grau ordered an MRI of Petitioner's cervical spine. However, in order to obtain insurance coverage of the MRI, Petitioner had to complete more PT. *See* Ex. 17 at 10; Ex. 18 at 8. Dr. Grau listed the diagnoses of right shoulder subacromial bursitis with impingement and cervicalgia. *Id.* at 10.

At an evaluation at Cora PT on December 14, 2022, Petitioner reported that she was "still having pain in a 2-3 inch area between her shoulder and neck" and had "pulling" when reaching to the side, which she had not experienced previously. Ex. 18 at 8. Petitioner participated in eight more PT sessions in December 2022 and January 2023. *See* Ex. 18 at 12-26. These sessions were labeled by Cora PT as "cervical/thoracic spine," but as with Petitioner's previous course of PT, some of the therapist notes and exercises also addressed Petitioner's right shoulder pain. *See id.*

Petitioner was discharged from PT on January 10, 2023, with a home exercise program when she maximized her insurance benefits. *Id.* at 29. At her last session, Petitioner reported 4/10 pain and that she continued to have "tightness all along the right side of her neck and into the right shoulder." *Id.* at 26. Petitioner further described the tightness as being "in the shoulder blade, joint, and muscles of the neck/shoulder." *Id.*

On February 13, 2023, Petitioner was seen by PA Delong. Petitioner was doing "fairly well with her surgery," but complained "more of radicular symptoms in the right upper extremity with pain radiating to the right posterior shoulder to the hand," as well as paresthesia and weakness. Ex. 19 at 8. PA Delong's assessment was "right shoulder pain status post arthroscopy," "right cervical radiculopathy," "cervical [degenerative disk disease]," and "cervicalgia." *Id.* at 19. PA Delong recommended an MRI of the cervical spine to evaluate for a herniated disk protrusion on the right side. *Id.*

At a follow-up appointment with PA Delong on April 17, 2023, Petitioner stated that she was not seeing any improvement after surgery and had "worsening right shoulder pain" in certain positions and why lying on her right side. Ex. 20 at 12. Petitioner also had "episodic radicular symptoms, though not occurring consistently." *Id.* PA Delong recommended another MRI to "evaluate for progressive rotator cuff pathology" and suspected a possible rotator cuff tear. *Id.* at 13. PA Delong also administered a steroid injection to Petitioner's right shoulder. *Id.* At an appointment with PA Delong on May 16,

2023, he again noted Petitioner's persistent, worsening, and debilitating right shoulder pain, but there was no mention of radicular symptoms. *See* Ex. 20 at 15.

On August 29, 2023, over one year after the surgery, Petitioner saw PA Delong and repeated her complaint of persistent right shoulder pain, especially when lying on her right side and with overhead movements. Ex. 22 at 7. Petitioner requested and received another steroid injection. *Id.* at 7-8. PA Delong's assessment was right shoulder subacromial bursitis with impingement and a suspected SLAP tear. *Id.* at 8. PA Delong ordered an MRI of the right shoulder.[9] *Id.*

Petitioner had an appointment with PA Embry on November 1, 2023, to discuss the MRI results. *Id.* at 10. At this appointment, Petitioner continued to complain of right shoulder pain and "neck and right-sided parascapular pain that radiates down the arm." *Id*. PA Embry assessed right shoulder subacromial bursitis with impingement and also cervical degenerative disk disease with radiculopathy. *Id.* at 11. Petitioner had a positive Hawkins impingement test. *Id.* at 11. The treatment plan was that Petitioner would undergo an MRI of the cervical spine and potentially a cervical epidural. *Id.* However, Petitioner did not file any additional medical records.

### III. Analysis

#### A. Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A petitioner may prevail on his claim if he has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Table. Section 11(c)(1)(C)(i). If a petitioner establishes a Table injury, causation is presumed.

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. *Id.* at 13(b)(1). Further, a special master may find that "the first symptom or manifestation of onset . . . described in a petition occurred within the time period described in the [Table] even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." *Id.* at 13(b)(2).

---

[9] After dealing with an initial insurance denial, Petitioner underwent the MRI on October 30, 2023. Ex. 22 at 18. The MRI showed post-operative changes but no tearing of the rotator cuff. *Id.* at 11.

10

"Medical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Such records "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions" and are "generally contemporaneous to the medical events." *Id.* Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).

However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Id.* at *19. And the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Vaccine Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). A Table SIRVA claim requires proof of onset of shoulder pain within 48 hours of vaccination. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii). The criteria establishing a SIRVA under the accompanying qualifications and aids to interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the

shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B.  Petitioner Has Established by Preponderant Evidence the Onset of Right Shoulder Symptoms Within 48 Hours Post-Vaccination

The first entitlement issue for a Table SIRVA that Respondent disputes is whether Petitioner's right shoulder pain began within 48 hours of her October 5, 2018 vaccinations. Respondent relies on the following four points to argue that Petitioner's medical records are ambiguous and inconsistent as to onset:

- When Petitioner first complained of right shoulder pain to PA Webb, she described the pain as starting one month ago, when the vaccinations had actually occurred 20 days prior, thus placing the onset of her symptoms before the vaccinations;

- Petitioner failed to mention any right shoulder pain or any onset date at the November 2, 2018 appointment with PA Webb;

- On April 16, 2019, Petitioner first reported pain "ever since" the vaccinations, but did not specify that the pain began within 48 hours; and

- It was not until December 10, 2019 (more than 13 months post-vaccination), that Petitioner first reported that her pain began "immediately following the injection."

*See* Rule 4(c) Report at 10; Resp't Br. at 3. To refute this argument, Petitioner highlights cases in which a failure to articulate a precise date of onset did not defeat entitlement, and lists a large number of records in which she consistently told her treaters that she experienced right shoulder pain attributable to the October 5, 2018 vaccinations. *See* Pet'r Br. at 12-13; Pet'r Reply at 2, 4.

The first record from a visit with PA Web certainly is not supportive of onset, since it identifies a date prior to vaccination. However, "[a] petitioner's errors or inconsistencies in reporting the onset of his or her symptoms are relevant evidence, but do not by themselves defeat a finding of onset within 48 hours." *Reynolds v. Sec'y of Health & Hum. Servs.*, No. 19-1683V, 2023 WL 3713694, at *7 (Fed. Cl. Spec. Mstr. May 30, 2023). The Vaccine Act allows me to "find onset within the Table period despite having to weigh contrary evidence," such as when a petitioner "displayed a poor memory for dates," resulting in one or more inaccurate descriptions of onset being reflected in the medical records. *See id.* at *8 (citing Section 13(b)(2)). For example, I found that this QAI element was met when a petitioner reported that her symptoms had started in "early September," when she had in fact received the vaccination on September 17, 2019. *Miller v. Sec'y of Health & Hum. Servs.*, No. 20-604V, 2022 WL 3641716, at *3 (Fed. Cl. Spec. Mstr. July 22, 2022).

Respondent has acknowledged that Petitioner's medical records "did not indicate any recent history of right shoulder injury or pain." Rule 4(c) Report at 2. Given the total lack of any prior reference to an issue with her right shoulder, Petitioner's statement to PA Webb on October 25, 2018 that the pain "initially started one month ago," Ex. 3 at 47, can reasonably be read as an incorrect estimate of how much time had passed since she received the vaccinations twenty days earlier. I do not find that Petitioner's inaccurate recollection in this single record outweighs other instances in which she consistently placed onset immediately after vaccination.

Respondent's assertion that Petitioner's April 16, 2019 report of pain "ever since" vaccination is not sufficiently specific also fails to recognize that within the Vaccine Program, terms like "since," "shortly after," and "following" the vaccination are typically understood to "mean *very* close in time – immediately, or at most within a day or two"

13

after vaccination. *Flowers v. Sec'y of Health & Hum. Servs.*, No. 20-285V, 2024 WL 2828211, at *11 (Fed. Cl. Spec. Mstr. May 8, 2024), *mot. for rev. den'd*, 173 Fed. Cl. 613 (2024). "Nor should [R]espondent have the expectation that patients or treating physicians will specifically conform their language to the precise terms of the Vaccine Injury Table." *O'Leary v. Sec'y of Health & Hum. Servs.*, No. 18-584V, 2021 WL 3046617, at *10 (Fed. Cl. Spec. Mstr. June 24, 2021). The language used in the April 16, 2019 record is not vague or ambiguous.

Respondent's other points simply misstate the documents cited. Petitioner must have reported right shoulder (and neck) pain to PA Webb on November 15, 2018, because he listed it in his review of Petitioner's musculoskeletal system and referred her to PT. Ex. 3 at 45. Also, in claiming that it was not until December 10, 2019 that Petitioner first reported that her pain began immediately following the vaccination, Respondent entirely ignores Petitioner's five appointments with Dr. Belhasen in June through October 2019. *See* Rule 4(c) Report at 10; Resp't Br. at 3. At these appointments, Petitioner repeatedly indicated that her pain began shortly after vaccination, including specifying that it began that evening. *See* Ex. 3 at 43; Ex. 4 at 44, 58, 74, 89.

Despite some imprecision across medical records and specialists (not uncommon in SIRVA cases), the totality of the evidence supports a finding of onset within 48 hours. There is no evidence truly suggesting an earlier or later onset of symptoms. Petitioner does not only offer her own affidavit testimony, as Respondent suggests. *See* Rule 4(c) Report at 3. Instead, Petitioner's affidavit conforms with and bolsters her medical records. I find that Petitioner has established onset of right shoulder pain within 48 hours.

### C. Petitioner Has Established by Preponderant Evidence that No Other Condition or Abnormality Would Explain Her Symptoms

The fourth Table QAI asks whether there is a condition or abnormality present that would explain Petitioner's symptoms. *See* 42 C.F.R. § 100.3(c)(10)(iv). Respondent argues that the medical records establish that Petitioner had cervical radiculopathy, as diagnosed by a neurologist and confirmed by an EMG. Rule 4(c) Report at 10-11. In response, Petitioner argues that this diagnosis occurred years after the vaccination, and thus does not explain her right shoulder symptoms close-in-time to vaccination, or outweigh the "functional tests and physical observations typically associated with a SIRVA injury . . . ." Pet'r Br. at 16-18; Pet'r Reply at 6-7.

Although Petitioner was found to have cervical radiculopathy in August 2021, the diagnosis by itself does not resolve the question of whether this condition would explain Petitioner's right shoulder symptoms. It is true that Petitioner saw a neurologist,

underwent an EMG, was diagnosed with cervical radiculopathy, and described neurological symptoms like numbness, weakness, and radiating pain from her neck into her shoulder or from her shoulder and down her arm. In particular, Petitioner complained to Dr. Acob of numbness and tingling that had been "occurring in an intermittent pattern for 3 years," which would suggest that Petitioner had been experiencing this issue since before the vaccination. Ex. 12 at 15. At other appointments, however, Petitioner denied numbness, tingling, or radiating pain and received diagnoses typical for SIRVA cases, such as subacromial bursitis with impingement. The facts are further complicated because Petitioner's treatment for her right shoulder pain overlapped in some instances with treatment for neck and back pain, particularly when she participated in PT.

In consideration of Petitioner's medical condition as a whole, I resolve this QAI in favor of Petitioner, despite the evidence of a subsequent distinguishable condition. I give significant weight to how Petitioner and her treaters consistently addressed her right shoulder pain as an injury to the musculoskeletal structures of the shoulder -- separate from her neck pain, back pain, and cervical radiculopathy. This is not a case in which the petitioner received primarily neurological treatment or reported her shoulder symptoms as part of a constellation of neurological issues. Petitioner's treaters never "shift[ed] away" from the initial diagnosis of bursitis to cervical radiculopathy or any other type of nerve injury. Cf. Achanzar v. Sec'y of Health & Hum. Servs., No. 21-2044V, 2024 WL 5298067, at *9 (Fed. Cl. Spec. Mstr. Nov. 25, 2024). Further, Petitioner's complains of shoulder pain were not "secondary" to neurologic concerns like weakness. Cf. Wessinger v. Sec'y of Health & Hum. Servs., No. 21-518V, 2023 WL 8234551, at *8 (Fed. Cl. Spec. Mstr. Oct. 23, 2023). Indeed, after several appointments with Dr. Acob's team, Petitioner sought out an orthopedic evaluation and second opinion at Kentucky Orthopedics and Spine, which lead to a determination that she would benefit from surgery.

The fact that Petitioner continued to receive orthopedic treatment and continually demonstrated positive physical signs of a right shoulder injury on MRIs and upon examination by physical therapists and orthopedists weighs heavily in her favor. The evidence here demonstrates that Petitioner suffered from simultaneous conditions, related and unrelated to her vaccination, in her right shoulder and cervical and thoracic spine. See Nargi v. Sec'y of Health & Hum. Servs., No. 19-1859V, 2024 WL 4814752, at *9 (Fed. Cl. Oct. 11, 2024); see also Begay v. Sec'y of Health & Hum. Servs., No. 20-0494V, 2021 WL 4165028, at *5 (Fed. Cl. Aug. 12, 2021). Petitioner has proven by a preponderance of the evidence that cervical radiculopathy would not explain her symptoms. See Durham v. Sec'y of Health & Hum. Servs., No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. May 2, 2023). Although this finding could affect damages, it does not defeat entitlement. Of course, Petitioner cannot receive compensation for treatment of non-SIRVA issues, and this is highly relevant to damages.

**Conclusion and Scheduling Order**

Respondent does not raise any other objections to entitlement. *See generally* Rule 4(c) Report. Based on my independent review, I find that Petitioner has preponderantly established all requirements for a Table SIRVA claim. 42 C.F.R. § 100.3(c)(10). Accordingly, she need not prove causation-in-fact. Section 11(c)(1)(C). I also find that Petitioner has satisfied all other statutory requirements. Section 11(c)(A), (B), and (D).

For the foregoing reasons, **I find that Petitioner has established entitlement and is thus entitled to compensation for a right-sided Table SIRVA following her October 5, 2018 flu vaccine administration.**

The case is now formally in the damages phase. The parties are encouraged to pursue informal resolution of an appropriate damages award. If the parties determine that informal resolution is not possible, they should be prepared to promptly brief the appropriate award of damages.

**By no later than Friday, October 10, 2025**, Petitioner shall file a Status Report updating me on the parties' efforts towards informally resolving damages.

IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master